**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LESLEY DEMOND,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:17-CV-1322-D** |
| | § | |
| **INFINITI HR LLC, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the *Order of Reference*, filed July 24, 2017 (doc. 31), before the Court is

*Counter-Plaintiff Online Sales Step By Step, LLC d/b/a eGrowth Partners' Motion for a Temporary*

*Restraining Order*, filed July 23, 2017 (doc. 27). Based on the relevant filings and applicable law,

the motion should be **DENIED**.

## I. BACKGROUND

On May 17, 2017, Lesley Demond (Plaintiff) filed suit against Infiniti HR, LLC (Infiniti),

Online Sales Step By Step, LLC d/b/a eGrowth Partners (eGrowth),[1] NCES-eGrowth Partners

Employee Group Benefit Plan (Plan), and Cynthia Gail Stine (Stine) (Defendants). (doc. 1 at 1-3.)[2]

She alleged overtime and minimum wage violations under the Fair Labor Standards Act (FLSA),

breaches of fiduciary duties in violation of the Employee Retirement Income Security Act of 1974

(ERISA), violations of COBRA, equitable estoppel under federal common law, and defamation

during the time she worked in various capacities for eGrowth, Stine, Infiniti, and related entities

owned by Stine. (*Id.* at 1-9.)

---

[1] Although Plaintiff's complaint names this defendant as "EGrowth," it formats its name as "eGrowth." (*See* docs. 1, 28.)

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff began working as an independent contractor for Stine in 2000. (doc. 29 at 5.) In January 2005, she executed a Consulting Services Agreement with Stine Serdar, Inc. (Stine Serdar), a Texas corporation owned by Stine, which contained confidentiality and non-disclosure restrictions.[3] (*Id.* at 5, 14.) From 2005 through 2015, Plaintiff received various assignments from Stine Serdar. (*Id.* at 5) It then assigned all of its rights under the Consulting Services Agreement to C&M Success Enterprises, Inc. (C&M), another company owned by Stine. (*Id.* at 4-5.)

In 2014, Stine began to assist Amazon sellers with reinstating their accounts, and she began marketing her Amazon reinstatement services in April 2015. (*Id.* at 4, 7.) In developing this business, Stine created forms, drafted standard operating procedures, and built a database of resources. (*Id.* at 5, 7.) She also created a standardized process for handling all steps of the appeal of an Amazon suspension and developed a list of internal Amazon contacts, which she utilizes as part of her business. (*Id.* at 7-8.) According to Stine, "[o]ur approach is both unique and proprietary and was developed at great expense after much trial and error." (*Id.* at 10.) Over time, Stine continued to refine and further develop her approach and procedures and spent more than $50,000 in subscription fees and consulting and customization fees in building out its custom and proprietary processes, client services, marketing campaigns, and automated internal tasks. (*Id.* at 12-13) (noting "[o]ur highly customized proprietary processes form eGrowth's 'secret sauce'"). Her company has also developed a large list of existing and potential clients. (*Id.* at 13.) Stine and her various companies took steps to protect her information and the resources utilized in the Amazon reinstatement business. (*Id.* at 15-17.)

---

[3] According to Plaintiff's declaration, this agreement was actually with PRTek, a public relations firm, which has since dissolved. (doc. 39-1 at 16) ("The consulting services agreement that I previously signed with [Stine] was for a company called PRTek, a public relations firm. That firm dissolved. Any work I did with [Stine] after the dissolution was **not** covered by the agreement.") (emphasis in original).

Her new business venture grew and she hired and trained consultants and employees to meet her demand. (*Id.* at 4.) Stine hired Plaintiff, through C&M, in May 2015 as an independent contractor to assist her with her Amazon reinstatement business. (*Id.* at 5-6.)

While Plaintiff was working as an independent contractor for C&M, Stine formed Online Sales Step By Step, LLC (OSSBS) to handle her Amazon seller suspension business. (*Id.* at 6.) Stine presented Plaintiff with a contractor agreement with OSSBS in May 2015, but she never signed it nor agreed to sign it. (doc. 39-1 at 16.) Plaintiff and another individual entered into discussions with Stine to purchase a membership interests in OSSBS, but no purchase was ever finalized. (*Id.*) After working as an independent contractor, Plaintiff became an employee of C&M on September 15, 2016. (doc. 29 at 6.) When she began her employment, Stine presented Plaintiff with an Employment Agreement that contained confidentiality provisions and restrictive covenants.[4] (*Id.* at 6-7.) Plaintiff objected to several provisions of the agreement, including the breadth of the non-compete restrictions, and Stine made Plaintiff's requested changes. (*Id.* at 7.) Plaintiff did not sign the agreement. (docs. 29 at 7; 39-1 at 6, 12.)

Plaintiff continued to be an employee of C&M, which was then operating under the trade name eGrowth, until December 31, 2016. (doc. 29 at 6.) In January 2017, Plaintiff became an employee of OSSBS, which also operated under the name eGrowth. (*Id.* at 6.) Stine owns and runs all aspects of eGrowth. (*Id.* at 3.) At that time, Stine reminded Plaintiff to sign the Employment Agreement; she did not, "but continued her employment as if she had signed it." (*Id.* at 7.) During her employment, Plaintiff participated in company strategy sessions about eGrowth's marketing and

---

[4] Plaintiff thinks it was drafted in October or November 2016. (doc. 39-1 at 4.)

growth plans. (*Id.* at 18.) Plaintiff was terminated in March 2017.[5] (*Id.* at 6.) Stine contends that

she learned that Plaintiff never signed the Employment Agreement after the termination. (*Id.* at 15.)

Stine then offered Plaintiff several options and proposals to get her to sign a non-compete

agreement and the Employment Agreement, but Plaintiff refused to sign. (doc. 39-1 at 7, 21.)

Plaintiff returned a laptop and desktop computer that were issued to her by eGrowth after she was

terminated. (doc. 29 at 21.) Both computers were wiped clean, all of the data had been deleted, and

they contained computer viruses. (*Id.* at 21-22.) Because the computers were wiped clean, eGrowth

could not determine if any files were taken from the computers prior to their return. (*Id.* at 22.)

According to Plaintiff, she did not retain any client files, but the computers were wiped so that her

personal files, financial information, and other data would be erased, and the machines would be

returned in the manner that she received them from the manufacturer. (doc. 39-1 at 8, 14.)

Moreover, she ensured that all of her client work and work product was uploaded to eGrowth's

system. (*Id.* at 14.) Since her termination, Plaintiff has worked on her own in the Amazon

reinstatement services area in competition with eGrowth and has indicated online that she is hiring

employees to work for her and expand her competing business. (doc. 29 at 18-19.)

On May 17, 2017, Plaintiff sued Defendants. (doc. 1.) On July 23, 2017, eGrowth filed

counterclaims against Plaintiff. (doc. 24 at 12-13.) It alleges that she misappropriated its trade

secrets in violation of the Texas Uniform Trade Secrets Act, common law unfair competition and

misappropriation, conversion, fraud, promissory estoppel, and tortious interference with a

prospective relationship. (doc. 24 at 15-21.) It requested damages, "a Temporary Restraining Order

---

[5] Plaintiff notes that "[a]ccording to Stine's Motion to Dismiss, my termination was effective March 10, 2017, but she notified me on March 19, 2017. Technically, these options were presented post-termination of my employment." (doc. 39-1 at 7 n.2.)

and a Preliminary Injunction in favor of OSSBS and against [Plaintiff], maintaining the *status quo ante* and prohibiting her conduct," a judgment in its favor, pre-judgment and post-judgment interest, attorneys' fees and costs, and other proper relief. (*Id.* at 15-22.) That same day, eGrowth filed its motion for a temporary restraining order. (docs. 27, 28.) Plaintiff responded on July 28, 2017, and filed an amended response and appendix on July 31, 2017.[6] (docs. 38-43.) eGrowth replied on August 1, 2017. (doc. 44.)

## II. TRO

eGrowth seeks a temporary restraining order (TRO) under Fed. R. Civ. P. 65(b) precluding Plaintiff from using, disclosing, or transmitting eGrowth's trade secrets or confidential business information and ordering her to return all records, documents, or information pertaining to eGrowth's trade secrets or confidential business information. (doc. 27 at 1.)[7]

### A. <u>Standard</u>

Rule 65(b)(1) of the Federal Rules of Civil Procedure provides that a party may obtain a TRO without notice to the other side if it satisfies the following requirements:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). Because Plaintiff has received notice and has filed a response to eGrowth's

---

[6] The amended response states that it was filed to "ensure compliance with Local Rule 7.1(i) regarding Appendix numbering requirements, correction of citations to the record, and ensure page numbers were on the table of authorities." (doc. 40 at 1 n.1.) Plaintiff did not request leave to file an amended response or appendix, however, so it will not be considered. Even if considered, the ultimate recommendation would not change.

[7] eGrowth contends that it will later file a motion for preliminary injunction under Rule 65(a). (doc. 28 at 6 n.1.)

request, these elements need not be considered.[8] (*See* docs. 38, 39.)

"To obtain a temporary restraining order, an applicant must show entitlement to a preliminary injunction." *Mktg. Investors Corp. v. New Millennium Bank*, No. 3:11-CV-1696-D, 2011 WL 3157214, at *1 (N.D. Tex. July 26, 2011) (citations omitted); *see Hassani v. Napolitano*, No. 3:09-CV-1201-D, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) (noting A TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief"). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movant must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Tex. Midstream Gas Servs., LLC. v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) (citation omitted). The party seeking relief bears the burden of persuasion on all four requirements. *See Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

## B.    Likelihood of Success

To establish the first element of likelihood of success on the merits, a movant "must present a prima facie case but need not show that he is certain to win."[9] *Janvey v. Alguire*, 647 F.3d 585,

---

[8] Other courts within this district that have considered TROs after a response had been filed, as in this case, focused their analyses exclusively on the factors considered in obtaining a preliminary injunction. *See, e.g., Horner v. Am. Airlines, Inc.*, No. 3:17-CV-0665-D, 2017 WL 978100 (N.D. Tex. Mar. 13, 2017) (Fitzwater, J.); *May v. Wells Fargo Home. Mortg.*, No. 3:12-CV-4597-D, 2013 WL 2367769 (N.D. Tex. May 30, 2013) (Fitzwater, C.J.); *All. Wireless Techs., Inc. v. Casella-Wiseman*, No. 3:13-CV-245-L, 2013 WL 3724889 (N.D. Tex. July 16, 2013).

[9] Prima facie case is defined as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Prima Facie Case*, BLACK'S LAW DICTIONARY (10th ed. 2014).

596 (5th Cir. 2011) (citation omitted). "A prima facie case does not mean [the movants] must prove they are entitled to summary judgment." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 684-85 (N.D. Tex. 2016) (citing *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009)). Nor is a movant required to prove his case in full to obtain a preliminary injunction. *See id.* (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). The first element is assessed by looking at standards provided by substantive law. *Janvey*, 647 F.3d at 596 (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).

eGrowth's motion relates to both trade secrets and confidential business information, (doc. 27 at 1), but its brief clarifies that its confidential business information is included within the alleged trade secrets, (doc. 28 at 6, 21) ("eGrowth's confidential business and proprietary information fall well within the scope of trade secret protection."). To establish a cause of action for trade secret misappropriation under Texas law,[10] a plaintiff must show that: (1) a trade secret existed; (2) the defendant acquired the trade secret through "improper means"; and (3) the defendant disclosed the trade secret without the plaintiff's consent.[11] *Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015) (citing *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013) and Tex. Civ. Prac. & Rem. Code § 134A.002); *see AlliantGroup, L.P. v. Mols*, No. H-16-3114, 2017 WL 432810, at *10 (S.D. Tex. Jan. 30, 2017) (citing *Tracey*, 102 F. Supp. 3d at 914).

_____

[10] The parties appear to agree that Texas law applies to this claim. (*See* docs. 28 at 17; 38 at 7.)

[11] Under TUTSA, acquiring a trade secret through "improper means" is not the sole path to liability. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(3) (defining misappropriation); *see also His Company, Inc. v. Stover*, 202 F. Supp. 3d 685, 694-95 (S.D. Tex. Aug. 15, 2016) (considering the construction of Tex. Civ. Prac. & Rem. Code § 134A.002(3)), *vacated as moot by* No. 4:15-CV-00842, 2016 WL 6134939 (S.D. Tex. Sept. 8, 2016). Nevertheless, eGrowth explicitly relies on "improper means" to show Plaintiff's misappropriation of trade secrets. (*See* doc. 28 at 21) ("Defendant Demond has already misappropriated eGrowth's trade secrets by using improper means to acquire those secrets. That is, she agreed to enter into an employment agreement that acknowledges that eGrowth has protectable trade secrets and that she agrees to restrict their disclosure should she leave eGrowth.") (internal citations omitted).

### 1. Trade Secret

Under the Texas Uniform Trade Secrets Act (TUTSA):

(6) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that:

> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tex. Civ. Prac. & Rem. Code § 134A.002(6)(A)&(B).[12]  Whether a trade secret exists is usually a question of fact to be decided by the judge or jury as a factfinder.  *Gen. Universal, Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (per curiam).

To establish that it had trade secrets, eGrowth presents evidence that it expended a great deal of time and resources developing its protocols, procedures, software, Amazon contacts, and client lists.  (*See* doc. 29 at 7-10, 12-13, 14-15.)  Its evidence shows that it developed a "proprietary 'Canary' report"[13] as well as "spent more than $50,000 with Infusionsoft in subscription fees and consulting and customization fees in building out its custom and proprietary processes, client services, marketing campaigns, and automated internal tasks."  (*Id.* at 10, 12.)  It also developed a

---

[12] The adoption of TUTSA in 2013 expressly displaced the tort of trade secret misappropriation. *See Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 670 n.3 (S.D. Tex. 2015); *Baxter & Assocs., LLC v. D&D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *6 (Tex. App.—Dallas Feb. 15, 2017, no pet.).  In considering the status of the alleged trade secrets, both parties cite to some pre-TUTSA cases that considered the earlier common law factors.  (*See, e.g.*, doc. 28 at 19) (citing *Hill v. McLane Co., Inc.*, No. 03-10-00293-CV, 2011 WL 56061, at *3 (Tex. App.—Austin Jan. 5, 2011, no pet.) (mem. op.); (*see, e.g.*, doc. 38 at 8) (citing *Bluebonnet Petrol., Inc. v. Kolkhorst Petrol. Co., Inc.*, No. 14-07-00380-CV, 2008 WL 4527709, at *4 (Tex. App.—Houston [14th Dist.] Oct. 9, 2008, pet. denied) (mem. op.)).  In light of the TUTSA definition, these factors need not be considered. *See, e.g., Baxter*, 2017 WL 604043, at *6.

[13] According to eGrowth, "[t]he report outlines steps that our clients must accomplish themselves in order to clean their accounts. What is unique and proprietary about this report is where eGrowth draws underlying data included in the report and how we execute the services." (doc. 29 at 10.)

large list of approximately 20,000 existing and potential clients, which is not readily available and is highly confidential and valuable. (*Id.* at 13.) It further provided evidence that it derives substantial economic value from these protocols, procedures, software, Amazon contacts, and client lists; that they are not well-known within the industry; and that it takes measures to keep the information secret through, among other things, non-disclosure and non-compete agreements, use of secure virtual private networks, and data encryption. (*Id.* at 13-18.)

Plaintiff responds with evidence that some of eGrowth's alleged trade secrets, such as Amazon email addresses and the contents of its Canary Report, are generally known in the industry; that Stine has divulged much of the alleged trade secrets through her speaking engagements and her book; and that the pricing information is available on eGrowth's public website. (docs. 38 at 8-9; 39 at 16-19.) Although Plaintiff has presented evidence that some aspects related to eGrowth's business may be known to some in the related-business community or publicly available, eGrowth has presented evidence that no proprietary information is shared through Stine's lectures or book or available on its website. (*See* doc. 29 at 18-19.) Because eGrowth has presented evidence that it possesses information that derives independent economic value from not being generally known that is subject to reasonable efforts by eGrowth to maintain its secrecy, it has presented sufficient evidence for the purposes of a TRO to show the existence of a trade secret under Tex. Civ. Prac. & Rem. Code § 134A.002(6). *See, e.g., Baxter & Assocs., LLC v. D&D Elevators, Inc.*, No. 05-16-00330-CV, 2017 WL 604043, at *8 (Tex. App.—Dallas Feb. 15, 2017, no pet.) (considering trade secrets under Tex. Civ. Prac. & Rem. Code § 134A.002(6)).

### 2. *Improper Means*

"The plain language of § 134A.002(3)(B)(i) requires that a defendant 'acquire' knowledge

of the trade secrets at issue through 'improper means.'" *Tracey*, 102 F. Supp. 3d at 914; *see* Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(i). "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." *Tracey*, 102 F. Supp. 3d at 914 (citing Tex. Civ. Prac. & Rem. Code § 134A.002(2)).

To establish improper means, eGrowth presents evidence that Plaintiff misrepresented to Stine that she had signed the Employment Agreement to gain access to eGrowth's confidential trade secrets. (doc. 29 at 6-7.) According to Stine's declaration:

> I first gave [Plaintiff] a draft Employment Agreement in September 2016. [She] reviewed the Employment Agreement and disagreed about the breadth of the non-compete restriction. She requested a change . . ., which I agreed to make. . . . , and [Plaintiff] requested no other further revisions. [Plaintiff] did not sign it at that time, but *I reminded her in January 2017 to sign it. She agreed to sign it.* Though I did not realize it at the time, [Plaintiff] did not sign the Employment Agreement in January 2017, but continued her employment as if she had signed it.

(*Id.* at 7) (emphasis added).

According to eGrowth's evidence, Stine, through C&M, hired Plaintiff in May 2015 as an independent contractor to assist her with her Amazon reinstatement business.[14] (doc. 29 at 5-6.) Plaintiff already had access to eGrowth's alleged trade secrets regarding the Amazon reinstatement business when she was presented with the confidentiality provisions and restrictive covenants of the Employment Agreement in (at earliest) September 2016, and before she allegedly made a misrepresentation to Stine in January 2017. eGrowth has not shown that Plaintiff gained any new trade secrets after she made her alleged misrepresentation in January 2017, but before her

---

[14] As noted, Plaintiff began working as an independent contractor for Stine in 2000. (doc. 29 at 4, 5, 7, 15.)

employment was terminated.[15]  Accordingly, eGrowth has not shown Plaintiff acquired trade secrets through improper means.

eGrowth also argues that Plaintiff was bound by her existing Consulting Services Agreement that she executed while working as an independent contractor for one of Stine's other companies, but that "Stine and Plaintiff supplemented and modified [that agreement] over the course of their professional relationship together."  (doc. 28 at 11.)  To the extent that eGrowth attempts to rely on the Consulting Services Agreement, which Plaintiff signed while working for another entity owned by Stine, it has not shown that the agreement would be applicable to her work on the Amazon reinstatement business, or that a breach of that agreement would be considered an improper means under Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(i).  *See, e.g., Tracey*, 102 F. Supp. 3d at 914 (noting "[t]he fact that Defendant later allegedly breached the confidentiality provisions of the Agreements is irrelevant to the method by which he obtained access to the trade secrets in the first instance").  Accordingly, eGrowth has not shown that Plaintiff acquired any of its trade secrets by improper means.[16]  Because it has not shown this element, it has failed to make a prima facie showing that Plaintiff misappropriated eGrowth's trade secrets.

Because eGrowth has failed to meet its burden of making a prima facie showing of a likelihood of success on the merits, its application for a TRO should be denied.  *See Hassani*, 2009 WL 2044596, at *3 ("Because [the movant] cannot satisfy the first element of the four-part test, the court need not analyze the remaining three."); *see also CompuCom Sys., Inc. v. WJ Global, LLC*, No.

_____

[15] Even if the alleged misrepresentation was considered to have occurred in September 2016 when Stine allegedly presented Plaintiff with the Employment Agreement, instead of January 2017 when the alleged misrepresentation was made, the conclusion would not change.

[16] Because eGrowth has not shown the Plaintiff acquired trade secrets through "improper means," it is unnecessary to consider whether it has shown the third element of trade secret misappropriation, or to consider the Plaintiff's equitable defense of laches.  (doc. 38 at 11.)

3:14-CV-3625-L, 2014 WL 5032747, at *1 (N.D. Tex. Oct. 8, 2014) ("Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the TRO or preliminary injunction.").

## III. RECOMMENDATION

eGrowth's motion for a temporary restraining order should be **DENIED**.

**SO RECOMMENDED** on this 11th day of August, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE